Joel E. Elkins (SBN 256020)
jelkins@weisslawllp.com
**WEISSLAW LLP**
9100 Wilshire Blvd. #725 E.
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK GALLO,<br><br>                        Plaintiff,<br><br>                vs.<br><br>NIELSEN HOLDINGS PLC, JAMES A. ATTWOOD, JR., DAVID KENNY, THOMAS H. CASTRO, GUERRINO DE LUCA, KAREN M. HOGUET, HARISH MANWANI, JANICE MARINELLI MAZZA, JONATHAN MILLER, ROBERT C. POZEN, DAVID RAWLINSON, NANCY TELLEM, JAVIER G. TERUEL, and LAUREN ZALAZNICK,<br><br>                        Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Frank Gallo ("Plaintiff"), on behalf of himself and all others similarly situated, upon information and belief, including an examination and inquiry conducted

- 1 -

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

by and through his counsel, except as to those allegations pertaining to Plaintiff, which are alleged upon personal belief, alleges the following for his Complaint:

**NATURE OF THE ACTION**

1.      This is an action brought by Plaintiff against Nielsen Holdings plc ("Nielsen" or the "Company") and the members of Nielsen's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Nielsen's Global Connect business ("Connect") will be acquired by newly formed entities (collectively, "Purchaser") which are controlled by investment funds advised by affiliates of Advent International Corporation ("Advent") (the "Proposed Transaction").

2.      On November 1, 2020, Nielsen issued a press release announcing that it had entered into a Stock Purchase Agreement dated October 31, 2020 (the "Stock Purchase Agreement") to sell Connect to Purchaser.  Under the terms of the Stock Purchase Agreement, Nielsen will sell the equity interests of certain subsidiaries which contain Connect to Purchaser in exchange for: (i) $2,700,000,000 in cash, and (ii) a warrant to purchase equity interests in the company that will own Connect following the closing of the Proposed Transaction, exercisable in certain circumstances.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3.     On December 23, 2020, Nielsen filed a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC.   The Proxy Statement, which recommends that Nielsen stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the background of the Proposed Transaction; (ii) the financial projections and the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"); and (iii) Company insiders' potential conflicts of interest.   Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     In short, unless remedied, Nielsen's public stockholders will be irreparably harmed because the Proxy Statement's material misrepresentations and omissions prevent them from making a sufficiently informed voting decision on the Proposed Transaction.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6.      The Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company maintains offices located in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Nielsen.

9.      Defendant Nielsen is an England and Wales corporation, with its principal executive offices located at 85 Broad Street, New York, New York 10004 and offices located at 6255 W Sunset Boulevard, Los Angeles, California 90028.  The Company is a global measurement and data analytics company providing a view of consumers and markets worldwide.  Nielsen's common stock trades on the New York Stock Exchange under the ticker symbol "NLSN."

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10. Defendant James A. Attwood, Jr. ("Attwood") has been Chairperson of the Board since November 2019 and a director of the Company since 2006. Defendant Attwood previously served as Executive Chairperson of the Board on an interim basis from July 2018 to November 2019, Chairperson of the Board from January 2016 to July 2018, and Lead Independent Director of the Board from January 2015 to December 2015.

11. Defendant David Kenny ("Kenny") is Chief Executive Officer ("CEO") of the Company and has been a director since 2018.

12. Defendant Thomas H. Castro ("Castro") has been a director of the Company since 2020.

13. Defendant Guerrino De Luca ("De Luca") has been a director of the Company since 2017.

14. Defendant Karen M. Hoguet ("Hoguet") has been a director of the Company since 2010.

15. Defendant Harish Manwani ("Manwani") has been a director of the Company since 2015.

16. Defendant Janice Marinelli Mazza ("Marinelli Mazza") has been a director of the Company since 2020.

17. Defendant Jonathan Miller ("Miller") has been a director of the Company since 2020. Defendant Miller was appointed to the Board in connection with the Company's April 29, 2020 Cooperation Agreement with activist investor Elliott

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Management Corporation and certain of its affiliated funds (together, "Elliott"), which at the time had a 13% economic interest in the Company.

18.     Defendant Robert C. Pozen ("Pozen") has been a director of the Company since 2010.

19.     Defendant David Rawlinson ("Rawlinson") has been CEO of Connect since February 2020 and a director of the Company since 2017.

20.     Defendant Nancy Tellem ("Tellem") has been a director of the Company since 2019.

21.     Defendant Javier G. Teruel ("Teruel") has been a director of the Company since 2010.

22.     Defendant Lauren Zalaznick ("Zalaznick") has been a director of the Company since 2016.

23.     Defendants identified in paragraphs 10-22 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

24.     Advent is a global private equity firm focused on buyouts of companies in Western and Central Europe, North America, Latin America and Asia.  Advent has invested in over 350 private equity transactions in 41 countries, and as of June 30, 2020, had $58.4 billion in assets under management.

## SUBSTANTIVE ALLEGATIONS

- 6 -

**Background of the Company**

25.    Nielsen is a global measurement and data analytics company.  Nielsen provides clients with a comprehensive understanding of what consumers watch and what they buy and how those choices intersect.  The Company delivers critical media and marketing information, analytics and manufacturer and retailer expertise about what and where consumers buy and what consumers read, watch and listen to (consumer interaction across the television, radio, print, online, digital, mobile viewing and listening platforms) on a local and global basis.  Nielsen's measurement and analytical services help clients maintain and strengthen their market positions and identify opportunities for profitable growth.  The Company has a presence in approximately 100 countries and its services cover more than 90 percent of the globe's GDP and population.  Nielsen has significant investments in resources and associates all over the world, including in many emerging markets, and holds leading market positions in many of the Company's services and geographies.

26.    Prior to February 2019, Nielsen was aligned into two reporting segments: what consumers buy ("Buy") and what consumers read, watch and listen to ("Watch"). Beginning in February 2019, Nielsen realigned its business segments from Buy and Watch to Connect and Nielsen Global Media ("Media").  Each segment operates as a complete unit - from the conception of a product, through the collection of the data, into the technology and operations, all the way to the data being sold and delivered to the client.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

27.     The Connect and Media segments are built on a foundation of proprietary data assets that are designed to yield essential insights for clients to successfully measure, analyze and grow their businesses.  The Company's segments each consist of two categories: Measure and Predict / Activate in Connect and Audience Measurement and Plan / Optimize in Media.  These categories are based on Nielsen's core measurement platforms in both Connect and Media, while Predict / Activate and Plan / Optimize are designed to build on Company measurement capabilities to enhance client decision-making.

28.     Nielsen's Connect segment provides measurement services, which include core tracking and scan data (primarily transactional measurement data and consumer behavior information), and analytical services to businesses in the consumer packaged goods ("CPG") industry.  Nielsen's Connect services also enable its clients to better manage their brands, uncover new sources of demand, manage their supply chain issues, launch and grow new services, analyze their sales, drive merchandising efficiency and effectiveness in-store and improve their marketing mix and establish more effective consumer relationships.  The data is used by its clients to measure their market share, tracking billions of sales transactions per month in retail outlets around the world.  Its extensive database of retail and consumer information, combined with its advanced analytical capabilities, helps generate strategic insights that influence Nielsen's clients' key business decisions.  Nielsen's Connect segment represented approximately 47% of Nielsen's consolidated revenues in 2019.

29.     Nielsen's Media segment provides viewership and listening data and analytics primarily to the media and advertising industries for television, radio, digital and mobile viewing and listening platforms.  Nielsen's Media data is used by Nielsen's media clients to understand their audiences, establish the value of their advertising inventory and maximize the value of their content, and by Nielsen's advertising clients to plan and optimize their spending.   Nielsen's Media segment represented approximately 53% of its consolidated revenue in 2019.

30.     On August 13, 2018, Elliott filed a Schedule 13D with the SEC, reporting it had an 8.4% economic interest in the Company.  In the Schedule 13D, Elliott stated it would:

> encourage [Nielsen] to undertake a full strategic review of, and initiate a process to explore, the sale of [Nielsen] in full, in addition to the exploration of the sale of certain of [Nielsen's] businesses or assets, including transactions in which [Elliott] may seek to participate and potentially engage in, as a purchaser or investor.

31.     On November 7, 2019, Nielsen announced its plan to spin-off the Connect business.  The press release quoted defendant Attwood as stating:

> Nielsen has two strong and global franchises—Global Media and Global Connect. Following an extensive review process, which included an in-depth analysis of our businesses, strategies and market opportunities, the Board concluded that separating into two independent, publicly traded

- 9 -

companies is the best path to position each business for long term success

and maximize value creation . . . .   As independent companies, both

Nielsen—the Global Media business—and the new company consisting

of Global Connect will enjoy added flexibility and further strengthen their

paths toward a new phase of growth, productivity and industry leadership.

32.    On November 2, 2020, Nielsen announced its third quarter 2020 financial

results, reporting net income for the quarter of $7 million on a reported basis, compared

to a net loss of $472 million in the third quarter of 2019 and net income per share on a

diluted basis of $0.02 per share, compared to a net loss per share on a diluted basis of

$(1.33) per share for the third quarter of 2019.  Commenting on the Company's third

quarter financial results, defendant Kenny stated:

> We delivered strong results in the third quarter, building on our track
> record of successful execution.  All key metrics for both Media and
> Connect were in-line or ahead of expectations.  Our teams moved swiftly
> to enact our optimization plan, driving operational efficiencies and
> permanent cost savings.  This, in addition to actions taken earlier in the
> year in response to COVID-19 related revenue pressure, enabled us to
> drive strong adjusted EBITDA growth and higher free cash flow.  We
> have confidence in our ability to deliver on our objectives and guidance
> for the full year 2020. . . .

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

We made strong progress on key initiatives in the quarter, particularly cross-media measurement with expansion of our Connected TV footprint to now include YouTube and YouTubeTV.  We continue to focus on expanding our role in the ecosystem, enabling content and measuring outcomes across key advertising categories.  As we look forward, we remain focused on executing on our growth strategies that will enable us to better serve our clients.

**The Proposed Transaction**

33.     On November 1, 2020, Nielsen issued a press release announcing the Proposed Transaction.  The press release states, in relevant part:

NEW YORK, and BOSTON, November 1, 2020 — Nielsen Holdings plc ("Nielsen") (NYSE: NLSN) announced today that it has signed a definitive agreement under which affiliates of Advent International ("Advent"), one of the largest and most experienced global private equity investors, in partnership with James "Jim" Peck, former Chief Executive Officer of TransUnion, will acquire the Nielsen Global Connect business for $2.7 billion (subject to working capital, cash, debt-like items and other customary adjustments). Nielsen will also receive warrants in the new company exercisable in certain circumstances. Upon completion of the transaction, Nielsen Global Connect will be a private company with the flexibility to continue investing in the development and deployment of

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

leading-edge measurement products and solutions. The transaction was unanimously approved by Nielsen's Board of Directors.

"This is a win for both Nielsen Global Connect and for Nielsen (RemainCo), as well as for our shareholders," said David Kenny, Chief Executive Officer, Nielsen. "The sale of this business to Advent will deliver substantial value sooner than was anticipated through the planned spin-off and creates certainty for all stakeholders. The proceeds from the sale will allow Nielsen to significantly reduce debt, which will provide greater financial flexibility to execute our growth strategy and expand our role in the global media marketplace. At the same time, we are excited about this opportunity for Nielsen Global Connect and believe that moving forward as a private company will better position the business to accelerate its transformation and strengthen its market-leading position. With the support of Advent's resources and expertise, we believe the new company will create and define the next century of consumer and market measurement. We thank the entire Nielsen Global Connect team for their invaluable partnership and look forward to continuing a strong working relationship with them in the future."

Kenny added, "All of the terrific work done by so many to pursue a spin-off will position both businesses to thrive as standalone companies and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

will allow us to execute a smooth transaction. We are grateful for all of this dedicated work."

"Nielsen Global Connect is the gold standard in retail measurement, with exceptional insights and unrivaled scale and coverage of the global CPG and retail markets," said Peck. "As customers face a rapidly evolving marketplace, we recognize that they have high expectations for Nielsen Global Connect to help them meet these new demands and to build on its existing core platform and other retail measurement capabilities. We intend to work with David Rawlinson and the talented management team to accelerate the delivery of new capabilities and to continue the transformation underway to build an innovative, high-performing culture acutely focused on delivering value to customers around the world."

"Advent is thrilled to partner with Jim in driving this next phase of growth for Nielsen Global Connect," said Chris Egan, Managing Partner at Advent. "Advent has invested in data and information services companies for nearly three decades, and earlier this year we teamed up with Jim to identify a compelling business in the sector where we can apply our combined experience and resources to create value. We see tremendous potential to build on Global Connect's cutting-edge platform, drawing on

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

our global footprint and operational strength to further scale the business and advance its leadership across established and emerging markets."

David Rawlinson will remain CEO of Nielsen Global Connect through the close of the transaction and is expected to be part of the leadership team for the go-forward company. Upon close, Peck will be involved in the day-to-day strategic and operational activities of the company, which will be headquartered in Chicago, IL. In early 2021, the Global Connect business will be renamed NielsenIQ.

Nielsen will grant Nielsen Global Connect a license to brand its products and services with the "Nielsen" name and other Nielsen trademarks for 20 years following closing. Additionally, Nielsen and Advent will enter into agreements pursuant to which, among other things, Nielsen and Advent will provide certain transitional services to each other for periods of up to 24 months following closing, grant each other reciprocal licenses for certain data and corresponding services relating to that data for periods of up to five years following closing and grant each other licenses to use certain patents.

**BACKGROUND ON NIELSEN GLOBAL CONNECT AND TRANSACTION DETAILS**

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Nielsen Global Connect provides consumer packaged goods manufacturers and retailers with actionable information and a complete picture of the complex and changing marketplace that brands need to innovate and grow their business. The company offers data and builds tools that use predictive models to turn market observations into business decisions and winning solutions. These data and insights provide the essential foundation that makes markets possible in the rapidly evolving world of commerce.

Nielsen plans to use net proceeds of the transaction primarily to reduce debt and for general corporate purposes. On a pro-forma basis for the transaction, Nielsen expects year-end 2020 net leverage to be approximately 4X. The transaction is subject to approval by Nielsen shareholders, regulatory approvals, consultation with the works council and other customary closing conditions; it is expected to close in the second quarter of 2021.

**The Proxy Statement Contains Material Misstatements or Omissions**

34.    The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Nielsen's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

35.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the background of the Proposed Transaction; (ii) the financial projections and the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, J.P. Morgan; and (iii) Company insiders' potential conflicts of interest.

***Material Omissions Concerning the Background of the Proposed Transaction***

36.    The Proxy Statement fails to disclose material information concerning the background process leading to the Proposed Transaction.

37.    For example, according to the Proxy Statement, during the November 2019 through June 2020 timeframe Nielsen had "discussions with representatives of Elliott and other investors regarding their input on the spin-off, as well as on Nielsen and its businesses and strategic alternatives." Proxy Statement at 27.  The Proxy Statement, however, fails to disclose the details of these negotiations.

38.    In addition, the Proxy Statement fails to disclose the terms of the confidentiality agreements the Company entered into with potential bidders. Specifically, the Proxy Statement fails to disclose whether any of the standstills included in confidentiality agreements the Company entered into with potential bidders during the sale process, including, but not limited to parties referred to in the Proxy

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Statement as "Bidder D" and the "Mixed Consortium," contained a "don't-ask, don't-waive" ("DADW") standstill provision that is still in effect and presently precluding any potential counterparty from submitting a topping bid for Connect.

39.    The failure to disclose the existence of DADW provisions creates the false impression that a potential bidder who entered into a confidentiality agreement could make a superior proposal for Connect.   If the potential acquirer's confidentiality agreement contains a DADW provision, then that potential bidder can only make a superior proposal by (i) breaching the confidentiality agreement—since in order to make the superior proposal, it would have to ask for a waiver, either directly or indirectly; or by (ii) being released from the agreement, which if action has been done, is omitted from the Proxy Statement.

40.    Any reasonable Nielsen stockholder would deem the fact that a likely topping bidder may be precluded from making a topping bid for Connect to significantly alter the total mix of information.

41.    The omission of this information renders the statements in the "Background of the Transaction" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Nielsen's Financial Projections and J.P. Morgan's Financial Analyses***

42.    The Proxy Statement omits material information regarding Nielsen's financial projections.

- 17 -

43.     For example, with respect to Nielsen's financial projections for Connect, for each of the Board Direction Case, CIM Case, Trend Case, Trend with Cost Mitigants Case, and Upside Case, the Proxy Statement fails to disclose unlevered free cash flows ("UFCFs") and the line items underlying UFCFs.

44.     In addition, the Proxy Statement sets forth that at an April 16, 2020 Board meeting, J.P. Morgan and the Board reviewed "forecasted financial information that Nielsen management developed with respect to Connect, which reflected Nielsen's operating plan for the fiscal year ending December 31, 2020, adjusted for the impacts of the COVID-19 pandemic, various restructuring and separation costs, and updated corporate allocations." *Id*. The Proxy Statement fails, however, to disclose the details of management's forecasts for Connect presented at the April 16 Board meeting.

45.     The Proxy Statement also fails to disclose material information regarding J.P. Morgan's financial analyses.

46.     The Proxy Statement describes J.P. Morgan's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of J.P. Morgan's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Nielsen's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on J.P. Morgan's fairness opinion in determining whether to vote in favor of the Proposed Transaction.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

47.    With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the UFCFs for calendar years 2020 through 2024 utilized in the analysis; (ii) the definition used in the calculation of UFCF; (iii) the line items underlying UFCF; (iv) quantification of the inputs and assumptions underlying the discount rates ranging from 8.75% to 9.75%; and (v) the terminal value of Connect.

48.    With respect to J.P. Morgan's *Equity Research Analyst Valuations*, the Proxy Statement fails to disclose: (i) the individual equity research analyst valuations for the firm value of Connect observed; and (ii) the sources thereof.

49.    The omission of this material information renders the statements in the "Certain Financial Forecasts" and "Opinion of Nielsen's Financial Advisor" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Company Insiders' Potential Conflicts of Interest***

50.    The Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by the Company's insiders.

51.    The Proxy Statement sets forth, "It is possible that Connect employees, including Mr. Rawlinson, will enter into new compensation arrangements with Purchaser. Those arrangements may include, among other things, agreements regarding future terms of employment, the right to receive equity or equity-based awards of Purchaser and/or to receive retention bonus awards." *Id*. at 65.  Yet, the Proxy Statement fails to disclose the details of any employment and retention-related

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

discussions and negotiations that occurred between Advent and Nielsen executive officers, including who participated in all such communications, when they occurred and their content.  The Proxy Statement further fails to disclose whether any of Advent's proposals or indications of interest mentioned management retention or equity participation in the combined company.

52.    Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for Nielsen's stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

53.    The omission of this information renders the statements in the "Background of the Transaction" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

54.    The Individual Defendants were aware of their duty to disclose the above-referenced omitted information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other stockholders of Nielsen will be unable to make an informed voting decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# CLAIMS FOR RELIEF

## COUNT I

### Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

55.     Plaintiff repeats all previous allegations as if set forth in full.

56.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

57.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.   It  misrepresented  and/or  omitted  material  facts,  including  material information about the background of the Proposed Transaction, Nielsen's financial projections for Connect, the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by J.P. Morgan, and Company insiders' potential conflicts of interest.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

58.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

59.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

60.     Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Claims Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

61.     Plaintiff repeats all previous allegations as if set forth in full.

62.     The Individual Defendants acted as controlling persons of Nielsen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Nielsen, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

- 22 -
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

63.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.    The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.    They were, thus, directly involved in the making of the Proxy Statement.

65.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.    The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

66.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

67.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged

herein.  By virtue of their positions as controlling persons, these defendants are liable

pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of

defendants' conduct, Nielsen's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent

relief, including injunctive relief, in his favor on behalf of Nielsen, and against

defendants, as follows:

A.    Preliminarily and permanently enjoining defendants and all persons acting

in concert with them from proceeding with, consummating, or closing the

Proposed Transaction and any vote on the Proposed Transaction, unless

and until defendants disclose and disseminate the material information

identified above to Nielsen stockholders;

B.    In the event defendants consummate the Proposed Transaction, rescinding

it and setting it aside or awarding rescissory damages to Plaintiff;

C.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the

Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

D.    Awarding Plaintiff the costs of this action, including reasonable allowance

for Plaintiff's attorneys' and experts' fees; and

E.    Granting such other and further relief as this Court may deem just and

proper.

## JURY DEMAND

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: January 15, 2021

**WEISSLAW LLP**

Joel E. Elkins

By:

Joel E. Elkins
9100 Wilshire Blvd. #725 E.
Beverly Hills, CA 90210
Telephone:  310/208-2800
Facsimile:   310/209-2348
                -and-
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, NY  10036
Telephone: 212/682-3025
Facsimile:  212/682-3010

*Attorneys for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS